### In re Eduardo J. MARTINEZ and Maria G. Martinez, Debtors.

### No. 01–54109.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Aug. 5, 2002.

---

Hilary B. Bonial, Dallas, TX, for Auto One Acceptance Corp.

Lee Gordon, McCreary, Veselka, Bragg & Allen, P.C., Austin, TX, for County of Comal.

Brendetta Anthony Scott, Houston, TX, for Bank of America, N.A.

Paul W. Rosenbaum, San Antonio, TX, for debtors.

### MEMORANDUM DECISION ON MOTION FOR RELIEF FROM AUTOMATIC STAY

LEIF M. CLARK, Bankruptcy Judge.

This matter involves a motion for relief from automatic stay, filed by Bank of America, N.A. ("BofA"). The court writes to offer a solution to a continuing practical problem that arises with regularity in chapter 13 cases, not only in this district but nationwide.

The debtors in this case appeared to have fallen two payments behind on their home mortgage post-petition (and post-confirmation), so BofA filed a motion for relief from stay.[1] At the hearing, the debtors furnished the lender green cards showing that payments (certified checks or money orders) had in fact been sent to BofA by certified mail, and had evidently been received by BofA. The bank, to its chagrin, evidently lost the payments, which is what precipitated the filing of the motion. Because the debtors had used cashier's checks or money orders (and

---

1. In this district, post-petition mortgage payments in chapter 13 cases are the responsibility of the debtor to pay directly to the lender. Only the payments on pre-petition arrearages are included as part of the plan distribution. *See* 11 U.S.C. § 1322(b)(2). Also in this district, the property of the estate is not revested in the debtor upon confirmation. *See* 11 U.S.C. § 1327(c) (property revests in debtor upon confirmation, unless the court orders

otherwise). This continuation of the estate has the effect of sheltering the debtor and the debtor's assets with the automatic stay during the life of the plan. This positive protection has a negative side for the home mortgage lender, however. The lender cannot act to protect itself in the event of a default in the current mortgage payments until the lender gets relief from the automatic stay. *See* discussion *infra*.

hence were not awaiting "cancelled checks" as further evidence that the payments were cashed), and because they had gotten the green cards back, the debtors assumed their payments had been received and properly credited. They had no idea that BofA thought they were two months behind on their mortgage.

The debtors first indication from BofA that any of their payments had in fact not been credited came when they were served with BofA's motion to lift stay. Once the motion was filed, and the parties' lawyers spoke, the bank realized for the first time that the fault might be internal and began looking in-house for the missing checks. The bank ultimately tracked down the checks (still uncashed) before the hearing. The motion was thus resolved with the parties agreeing that the debtors would arrange for the checks to be reissued, bringing their account current.

The resolution of this matter was fairly straightforward and predictable. A relatively small human error was discovered and fixed. However, in order to arrive at this point, both parties were forced to incur the expense of filing and responding to a motion, including the filing fees and the attendant cost of the lawyers.[2] Obviously, had BofA been able to do the common sense thing—call or write the debtors the first month to inform that their payment for that month had not been re-ceived—the matter would have been quickly resolved.[3] And it would have been resolved without anyone having to call in the lawyers. As practical as that resolution obviously appears, the bank just as obviously dared not try it. BofA, like any similarly situated lender, was appropriately concerned that any such contact made during the pendency of the bankruptcy case would be treated as a violation of the automatic stay, subjecting the bank to possible sanctions. See 11 U.S.C. § 362(a)(1), (h) (any action to collect a pre-petition obligation is stayed upon the filing of a voluntary bankruptcy petition, and sanctions are to be assessed for wilful violations, in the amount of actual damages suffered by an individual debtor, plus punitive damages on a showing of malice on the part of the creditor); In re Price, 42 F.3d 1068, 1071 (7th Cir.1994).

A statutory provision designed to protect the debtor thus has the perverse consequence (at least in some situations) of actually costing the debtor. The creditor, fearful of sanction, instead files a motion for relief, often waiting until the default persists for two payments before filing. By the time the motion is heard, another month will have passed. The debtor now has to cure three months of past due payments in addition to now keeping the monthly mortgage payments current (to say nothing of keeping the plan payments

2. The filing fee for a motion to lift stay is $75. See 28 U.S.C. § 1930, Judicial Conference Schedule of Fees, Bankruptcy Court Miscellaneous Fee Schedule, at para. 20 (fee for filing a motion to lift stay is one-half the fee specified in section 1914(a) of title 28 for filing a motion in a civil proceeding other than an application for writ of habeas corpus). In this district, the standard charge allowed creditor's counsel for an uncomplicated motion to lift stay is $500. Debtor's counsel typically charge between $300 and $450 for responding to a motion to lift stay. The total transaction costs (exclusive of additional in-ternal costs incurred by lenders) is thus around $1,000.

3. Outside of bankruptcy, had the debtors been so notified, they would no doubt have immediately contacted the bank, telling them that the check had been sent in, and offering to show them a copy of the green card. That, in turn, would have led to the bank conducting an internal investigation to track down the missing payment, followed by a resolution along the lines ultimately reached on this motion.

current as well). The debtor also has to pay his attorney for responding to the motion, and often has to pay for the lender's attorney as well. The extra cost presses hard on the debtor's cash flow, increasing the likelihood that the debtor will default on plan payments, resulting in a dismissal of the case.

Were creditors allowed to promptly notify debtors when a payment is missing, debtors would often have the chance to cure the problem quickly, before it gets too large to fix, and without incurring the additional cost of stay litigation. That is surely a better practical result. In the view of this court, that is also a result that is possible to reach without doing violence to the Code.

■ It is true that section 362(h) directs that a court *shall* award "actual damages" for wilful violations of the automatic stay, defined as actions done intentionally, with knowledge of the existence of the bankruptcy. *See Fleet Mortgage Group, Inc. v. Kaneb,* 196 F.3d 265, 268 (1st Cir.1999); *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1105 (2d Cir. 1990); *Cuffee v. Atlantic Bus. & Community Dev. Corp. (In re Atlantic Business & Community Corp.),* 901 F.2d 325, 329 (3d Cir.1990); *Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989); *see also* 11 U.S.C. § 362(h). In some cases, however, the actual damages will be nearly nonexistent, in which case no dam-

ages at all would need to be awarded. In *Rosengren v. GMAC Mortg. Corp.,* 2001 WL 1149478 (D.Minn.2001), for example, the court awarded only $88 in damages, because that was all the debtor could prove in actual, out-of-pocket losses occasioned by the stay violation. The court added $150 in attorneys' fees to the award, but only because there were actual damages that warranted bringing the motion in the first place.[4] In that case, the creditor had simply notified the debtor that he was behind on his mortgage payments "only as a courtesy and in response to Rosengren's expressed desire to make up his late mortgage payment and keep his house." *See Rosengrens, supra.* A courtesy notification of the sort contemplated in this decision does nothing more than tell the debtor that he or she is behind by a payment, nothing more. Such a notification, far from causing actual damages, would actually prevent them—the debtor in our case would have been able to promptly remedy the confusion and miscommunication without having to incur additional attorneys' fees in responding to a formal motion for relief from stay. If there are no actual damages, then there can be no sanction.

■ Nor can it legitimately be claimed that actual damages are always present, in the form of attorneys' fees incurred in bringing the sanctions motion. If an attorney cannot identify actual damages incurred by the stay violation *before* filing the motion, then the attorney should

---

4. It could be argued that Rule 9011 would bar an attorney from bringing an action under section 362(h) if the violation in question had generated no damages and was both discrete and complete. In that circumstance, with no basis for recovering either actual or punitive damages, the only damages recoverable would be the attorneys' fees incurred in bringing the action. *See* FED.R.BANKR.P. 9011. Section 362(h) is designed to compensate an individual who *has been* harmed by the viola-

tion of the stay. It is not designed as a device to *generate* damages in the form of fees incurred in bringing the action. *See Putnam v. Rymes Heating Oils, Inc. (In re Putnam),* 167 B.R. 737, 741 (Bankr.D.N.H.1994) (the policy behind section 362(h) is designed to discourage wilful violations, but is tempered by a reasonableness standard born of a court's reluctance to foster a cottage industry built around satellite fee litigation).

not file the motion in the first place. As one court observed: "... [T]he unnecessary escalation of a matter of somewhat limited consequence which could have been resolved by much less lawyering does not make economic or emotional sense. Such escalation creates damages, magnifies costs, and burdens the system. More significantly, such efforts reveal a lack of perspective." *In re Newell*, 117 B.R. 323, 325 (Bankr.S.D.Ohio 1990). The *Rosengrens* court made a similar point, noting that "Attorneys are not at liberty to incur large legal fees simply because those fees will be shifted to their adversaries pursuant to Section 362(h) ..." *Rosengren, supra*, at *5 (citing *Price v. Pediatric Academic Assoc., Inc.*, 175 B.R. 219, 221 (S.D.Ohio 1994), on remand, *In re Price*, 179 B.R. 70 (Bankr.S.D.Ohio 1995)); *see also In re Clayton*, 235 B.R. 801 (Bankr. M.D.N.C.1998) ("[t]he automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the debtor"); *Shriver v. Tingley (In re Shriver)*, 46 B.R. 626, 629, 630–631 (Bankr.N.D.Ohio 1985) (a debtor cannot tell creditors they may repossess the collateral "if they want to," then file for sanctions when they do). In short, a debtor suffers no actual damages from merely being notified of a missed mortgage payment—and cannot "manufacture" such damages in the form of attorneys' fees for filing a sanctions motion that, but for those fees, has no independent basis for recovery.

■ Thus, though sending an innocent notice of a missed mortgage payment post-confirmation could constitute a "wilful" violation of the automatic stay within the meaning of the statute, it is a "no harm" violation that cannot, as a matter of law, justify a debtor's filing a motion for sanctions, because it generates no "actual damages" within the meaning of the statute.[5] As a matter of law, if mortgage lenders send informal notices of the sort recommended in this decision in chapter 13 cases, no sanctions will issue as a result of that notice.

The court realizes that the value of this ruling is extremely limited. A nationwide lender can take comfort that, in this judge's court, the lender will not be sanctioned for giving informal notices of missed mortgage payments to chapter 13 debtors. That same lender has little reason to alter their mortgage monitoring and collection process accordingly, however, because the lender has no confidence that any other court will concur with this court's legal conclusion. Unless courts nationwide sign on to the same practice, national lenders will have little or no incentive to try it out. The cost of implementing a new procedure nationwide could only be justified if lenders could be sure that the procedure would be accepted nationwide.

Still, any new idea starts as an embryo, easily killed off but carrying within itself the capacity to grow and develop into something strong and viable. Thus, the court, by this published opinion, encour-

**5.** To recover under Section 362(h), a debtor must show not only the existence of a "willful violation," but must also show that he or she was injured by the violation. The mandatory tone of section 362(h) does not diminish a debtor's obligation to prove up actual damages. "A damage award [under 362(h)] must not be based on 'mere speculation, guess, or conjecture'." *See In re Craine*, 206 B.R. 594, 597 (Bankr.M.D.Fla.1997). At the conclusion of this opinion, the court offers a suggested form for "innocent notice" that, in the view of the court, would not (and could not be construed to) generate any "actual damages" (real or imagined). Such a notice is neither harassing nor badgering. Moreover, such a notice would not constitute a "continuing violation" of the sort that might otherwise justify seeking court intervention to make a creditor stop.

ages other courts to consider this simple approach to resolve a practical problem. If more and more courts sign on, creditors have a stronger motivation to expend the time, effort and money to develop internal national systems for promptly (and gently) notifying chapter 13 debtors of missed mortgage payments post-confirmation.[6] The overall benefits such a process would more than justify its adoption: lower total transaction costs, fewer motions for relief from stay, greater potential for curing defaults (by catching them early enough to be fixable), enhanced overall success in debtors' completion of the chapter 13 process (because keeping one's home is a principal motivation for completing the plan), and of course less attorneys' fees incurred by debtors.

A new process such as this deserves maximum guidance from the court. In calling for a simple "innocent notice" of a missed mortgage payment, the court has in mind a nonconfrontational, letter, informing the debtor that, according to the creditor's records, the debtor appears to have missed a payment. Here is a sample:

Dear:

According to our records, your monthly mortgage payment is $_____. Also, according to our records, we have not received your mortgage payment for the month of _____, which was supposed to have been received by _____. If our records are in error, either you or your attorney should contact us at [furnish telephone number] so that we can correct our records. If our records are correct, however, either you or your attorney should promptly contact us to see about bringing your mortgage current.

Any such "innocent notice" should be sent directly to the debtor (to maximize the chance to resolve the alleged default), but should also be sent to the debtor's attorney, as a courtesy (and to assure that the debtor's lawyer is aware of the situation). To clearly telegraph the nature of the notice, the creditor might even entitle the letter a "Martinez notice," referencing this decision.

Once the notice is received, the debtor may initiate contact with the creditor representative regarding the missed payment. The creditor is expected to listen to the debtor's explanation, to commence research in the event that payment is alleged to have been received, to answer questions regarding why the creditor believes the payment not to have been received. The creditor, of course, is not permitted to advise the debtor of consequences if payment is not received, because the debtor is presumed to know the consequences of not curing an outstanding default (the creditor will file a motion seeking relief from stay). If the dispute cannot be satisfactorily re-

---

6. The narrow scope of this proposal needs to be emphasized. Debtors are expected to keep current on their regular monthly mortgage obligations, a payment which is normally made "outside" the chapter 13 plan (some jurisdictions, such as the Middle District of Tennessee, have the chapter 13 trustee make this payment for the debtor, out of the debtor's monthly wage deduction). If the debtor defaults on this payment, the debtor risks losing the very thing that may well have been the principal impetus for filing in the first place—keeping the debtor's home. Other creditors, by contrast, are not paid directly by the debtor. They are instead paid by the chapter 13 trustee. For these creditors (including, in the usual case, car finance creditors), the only remedy is either a formal motion for relief from stay or a formal motion to dismiss the case.

In addition, the proposal only goes as far as notification of a missed payment. No other steps can (or should) be taken unless the mortgage company first obtains relief from the automatic stay. In addition, if the notice is limited as suggested by the court, then a debtor will have no claim under the Fair Debt Collection Practices Act.

solved, the creditor still has the option of filing a formal motion for relief from stay (at no greater cost than would otherwise have been incurred under existing procedures).

For the case at bar, the creditor's motion for relief from stay is denied, subject to the condition that the back payment be cured as announced by the parties on the record. No attorneys' fees will be awarded either party. For future cases, the court commends the foregoing procedure, both to creditors and to my colleagues on the bench.