**In re Rudy A. LOPEZ, Debtor.**

**Amrane Cohen, Chapter 13 Trustee, Appellant,**

v.

**Rudy A. Lopez, Appellee.**

**BAP No. CC–06–1359–MkBPa.**
**Bankruptcy No. SA 06–10420–TA.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on May 17, 2007.

Filed Aug. 3, 2007.

Linda S. Conway, Orange, CA, for Amrane Cohen, Chapter 13 Trustee.

Bruce D. White, Esq., White & Roseman, Newport Beach, CA, for Appellee.

Before: MARKELL,[1] BRANDT and PAPPAS, Bankruptcy Judges.

## OPINION

MARKELL, Bankruptcy Judge.

### INTRODUCTION

Amrane Cohen, a Chapter 13[2] Trustee, challenges the bankruptcy court's order confirming the Chapter 13 plan of Rudy Lopez, the debtor in this case. Mr. Lopez's plan permits him to pay his postpetition payments on notes secured by deeds of trust on his residence ("maintenance payments") directly to his creditors, while simultaneously allowing him to pay his prepetition arrears on those notes via the trustee. The trustee objected to the direct payment provisions; he believes Mr. Lopez should pay all amounts to him under the plan, and that he should then disburse those amounts to the creditors. For the reasons given below, this panel disagrees, and AFFIRMS the decision of the bankruptcy court, reported at *In re Lopez*, 350 B.R. 868 (Bankr.C.D.Cal.2006).

### FACTS

Mr. Lopez filed a Chapter 13 petition on March 31, 2006. At the time of the filing, he was delinquent on his obligations to creditors Wilshire Credit Corporation ("Wilshire") and Countrywide Home Loans, Inc. ("Countrywide"), which held first and second deeds of trust on his residence. Due to these delinquencies, foreclosure was imminent. The debtor's filing stopped the sale.

The debtor's Chapter 13 plan[3] proposed to pay the following debts "through the plan":[4] his arrears on notes secured by deeds of trust[5] to Wilshire and Countrywide; his delinquent property taxes; his debts owed to the State of California EDD;[6] the balance of his attorneys' fees; and the trustee's fee. To cover these amounts, the plan proposed a total monthly plan payment of $852. The plan payment is the amount of the net income after expenses shown on debtor's unchallenged schedules of income and expenses.

The plan additionally authorized Mr. Lopez to pay all payments coming due postpetition and which were related to his residence directly to the relevant creditors. These creditors included Wilshire Mort-

---

1. Hon. Bruce A. Markell, U.S. Bankruptcy Judge for the District of Nevada, sitting by designation.

2. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

3. The debtor's Chapter 13 plan uses the Central District of California's Form F–3015–1.1. That form includes an option which allows the debtor to pay debts secured by a principal residence directly to the affected creditors. *See* Central District of California Local Rule of Bankruptcy Procedure 3015–1(b)(4).

4. Throughout this opinion, the phrase "through the plan" is used to signify payments made to creditors *by the trustee*. Other cases have used different phrases, such as "through the trustee" or "by the trustee." When either phrase is quoted or used in this opinion, it signifies the same meaning as "through the plan."

5. The debts at issue in this case were secured by deeds of trust on the debtor's residence. Although deeds of trust and mortgages are not the same thing, the differences do not matter for purposes of this memorandum, and thus the terms will be used interchangeably.

6. We infer that EDD refers to the California Employment Development Department, and thus any debt to that entity would be entitled to the priority assigned to it in debtor's chapter 13 plan.

gage, Countrywide, and the Orange County Tax Collector.[7]

The trustee objected to all direct payments to the extent they related to an obligation in default at filing and that the plan would cure. The bankruptcy court overruled the trustee's objections to plan confirmation in a published decision. *In re Lopez*, 350 B.R. 868, 874 (Bankr.C.D.Cal. 2006). The trustee appeals.

### JURISDICTION

■ The bankruptcy court had jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A) and (b)(2)(L). This panel has jurisdiction under 28 U.S.C. § 158(a) and (b), which provide appellate jurisdiction over final orders. A Chapter 13 confirmation order is a final order. *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1087 (9th Cir.1999).

### STANDARD OF REVIEW

■ This panel reviews issues of law de novo and findings of fact for clear error. *Shook v. CBIC (In re Shook)*, 278 B.R. 815, 820 (9th Cir.BAP2002). Interpretations of the Bankruptcy Code that present legal questions are reviewed de novo. *Cal. Cent. Trust Bankcorp v. Been (In re Been)*, 153 F.3d 1034, 1036 (9th Cir.1998).

### DISCUSSION

The trustee's sole basis for objection is that the Bankruptcy Code[8] does not permit the debtor to directly pay maintenance payments on debts secured by his home when arrears related to that debt are simultaneously paid through the Chapter 13 plan.

### 1. Analysis of Pre–BAPCPA Case Law

■ The trustee contends that, despite longstanding practice in this and other circuits[9] and the comments of the leading treatise on Chapter 13,[10] pre-BAPCPA Ninth Circuit precedent does not permit debtors to make direct payments in these circumstances. ·

### A. Fulkrod and Chapter 12

The trustee's principal argument relies on Ninth Circuit precedent holding that direct payments may be impermissible in certain Chapter 12 family-farmer bankruptcies. Specifically, the trustee points to *Fulkrod v. Barmettler (In re Fulkrod)*, 126 B.R. 584 (9th Cir.BAP1991) ("*Fulkrod I*"), aff'd sub. nom. *Fulkrod v. Savage (In re Fulkrod)*, 973 F.2d 801 (9th Cir.1992) ("*Fulkrod II*") (collectively "Fulkrod") to support his position. In Fulkrod, a Chapter 12 debtor filed a plan providing for direct payment to three creditors with "impaired" claims.[11] *Fulkrod II*, 973 F.2d at

---

7. The monthly payments on the notes secured by the first and second deeds of trust total $3,078.

8. This case was filed after October 17, 2005, and thus references to the Bankruptcy Code are to it as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005) ("BAPCPA").

9. *See, e.g., Mendoza v. Temple–Inland Mortgage Corp. (In re Mendoza)*, 111 F.3d 1264, 1269 (5th Cir.1997); *Wagner v. Armstrong (In re Wagner)*, 36 F.3d 723 (8th Cir.1994); *In re Aberegg*, 961 F.2d 1307 (7th Cir.1992); *In re*

*Bettger*, 105 B.R. 607, 609 (Bankr.D.Or.1989); *In re Burkhart*, 94 B.R. 724, 725 (Bankr. N.D.Fla.1988).

10. *See* 5 Keith M. Lundin, *Chapter 13 Bankruptcy* § 401.1, p. 401–1 (3d ed. 2000 & Supp.2006) ("Direct payment has always been allowed by the Bankruptcy Code in Chapter 13 cases....").

11. Neither the BAP in *Fulkrod I* nor the Court of Appeals in *Fulkrod II* specifically defined "impaired claim." However, the BAP at one point discussed "impaired claims which the debtor could not insist upon but for the pro-

802. The bankruptcy court disagreed with this treatment and ordered that the trustee, rather than the debtor, make the payments through the plan. The debtor appealed, and both the Bankruptcy Appellate Panel ("BAP") and the Ninth Circuit affirmed. *Id.*

*Fulkrod* assumed that the issue was controlled by the trustee fee statute, 28 U.S.C. § 586. As applicable to Chapter 12 debtors, this statute provides that the trustee may collect "a percentage fee not to exceed—... (ii) in the case of a debtor who is a family farmer, the sum of—(I) not to exceed ten percent of the payments made under the plan of such debtor...." 28 U.S.C. § 586(e)(1)(B)(ii).

In analyzing this language, the BAP stated:

> We believe that Congress intended to use the term 'under the plan' [from 28 U.S.C. § 586(e)(1)(B)(ii)] to mean those payments which result from the operation of Chapter 12 bankruptcy law. Those payments should be made by the trustee, and the trustee's fee should be assessed against the funds received from the debtor for that purpose. Typically, those payments will involve impaired claims which the debtor could not insist upon but for the protections of Chapter 12.

*Fulkrod I*, 126 B.R. at 588. The BAP continued, stating that "[a] contrary provision in a plan or an order confirming a plan is permissible because the [C]ode contemplates flexibility in the payment of claims, and would allow direct payment of an impaired claim without trustee compensation in appropriate circumstances." *Id.*

Although it affirmed the BAP, the Ninth Circuit nevertheless stated that "[a]lthough the BAP hinted that Chapter 12 might permit a debtor to make direct payments to impaired creditors without trustee compensation in certain limited circumstances, that statement is neither necessary to its decision nor supported by statute." *Fulkrod II*, 973 F.2d at 803 (citation omitted).

The Ninth Circuit's dicta—that the BAP's statement regarding impairment was not "supported by statute"—is the source of the trustee's current argument.[12]

---

tections of Chapter 12." *Fulkrod I*, 126 B.R. at 588. In addition, the Court of Appeals stated in its holding "that Chapter 12 of the bankruptcy code does not authorize a debtor to make payments directly to creditors with claims modified by a plan of reorganization to avoid paying the bankruptcy trustee the statutory fee...." *Fulkrod II*, 973 F.2d at 803.

**12.** Although the Ninth Circuit's statement was made immediately after its holding "that Chapter 12 of the bankruptcy code does not authorize a debtor to make payments directly to creditors with claims modified by a plan of reorganization in order to avoid paying the bankruptcy trustee the statutory fee under 28 U.S.C. § 586," *Fulkrod II*, 973 F.2d at 803, it is nevertheless dicta. The court's statement was a direct response to the BAP's own dicta, which itself was unnecessary to the decision in that court. *See Fulkrod I*, 126 B.R. at 588. More importantly, the Ninth Circuit's statement was unnecessary to its decision, exceed-ing, as it did, the decision's stated scope. Earlier, the Ninth Circuit had stated that its decision was specifically tailored to situations in which the debtor attempted to make payments directly to creditors "to avoid paying the bankruptcy trustee the statutory fee." *Fulkrod II*, 973 F.2d at 803. The language at issue went far beyond this, denying direct payment by the debtor in *all* situations, not just when the debtor is acting in order to avoid the trustee's fee. In addition, as explored *infra*, if given literal meaning, it also conflicts with Section 1326(c). As such, the disputed language appears to be dicta, and not binding. *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir.2001) ("In determining whether it is bound by an earlier decision, a court considers not merely the 'reason and spirit of cases' but also 'the letter of particular precedents.' ... This includes not only the rule announced, but also the facts giving rise to the dispute, other rules considered and

Although dicta, *Fulkrod II* nonetheless deserves consideration in any determination as to what debts may be paid outside of a Chapter 13 plan.[13] *Cf. In re Barocio*, 2003 Bankr.LEXIS 2032, at *4 (Bankr.D.Alaska 2003) ("[W]hile other circuits which have examined the issue have concluded that debtors in chapter 12 and 13 cases can make direct payments on impaired claims in their plans, the Ninth Circuit's analysis in *Fulkrod* is applicable to chapter 13 as well as chapter 12 cases in this district."). But, after analysis, we conclude that it is not binding or determinative.

The section of the Judicial Code at issue in *Fulkrod*, 28 U.S.C. § 586, also applies to cases under Chapter 13, and thus it might be urged that *Fulkrod II* would require reversal here; that said, however, the particular clause analyzed by *Fulkrod*, namely 28 U.S.C. § 586(e)(1)(B)(ii) and its use of the phrase "under the plan," technically apply only to cases under Chapter 12. Moreover, *Fulkrod's* focus on this particular clause—28 U.S.C. § 586(e)(1)(B)(ii)—was both indirect and curious; in essence, the court inferred what should be paid through the plan by focusing on a statute that set the maximum percentage fee that the Attorney General may set for trustees under each chapter, and nothing else. As

shown *infra, part B.2*, there was a statute more directly on point—11 U.S.C. § 1226(c).

Nevertheless, the Code employs similar language in the section applicable in Chapter 13—28 U.S.C. § 586(e)(2). Paragraph (2) of that provision also sets compensation by reference to amounts received by Chapter 13 trustees "under plans."[14] This phrase, though, is not particularly illuminative; read in the abstract, the language indicates that trustees should receive a fee for all amounts they receive "under plans," but it does not purport to define what types of payments *should* be received "under plans," which is the issue in the present case.

There are significant differences between Chapter 12 and Chapter 13 that make the distinctions regarding their treatment under 28 U.S.C. § 586 appropriate. Chapter 13, for example, is substantially less permissive than Chapter 12 regarding the scope of allowed modifications of secured debt, particularly regarding modifications of claims secured by residences. Chapter 12 allows plans to make long-term modifications—that is, modifications that exceed the maximum five-year term of a Chapter 12 or 13 plan—to se-

---

rejected and the views expressed in response to any dissent or concurrence.")

**13.** Many courts have considered whether case law interpreting a particular chapter of the Bankruptcy Code is applicable to interpretations of substantially similar sections in other chapters. *See, e.g., Zabel v. Schroeder Oil, Inc. (In re Zabel)*, 249 B.R. 764, 766–67 (Bankr.E.D.Wis.2000); *In re Ryan*, 228 B.R. 746, 747 n. 2 (Bankr.D.Or.1999); *In re Palmer*, 224 B.R. 681, 684 (Bankr.S.D.Ill.1998); *In re Segura*, 218 B.R. 166, 171 n. 3 (Bankr. N.D.Okla.1998). These courts have almost universally found that such interpretations are applicable. *See Holloway v. Se. Ala. Med. Ctr. (In re Holloway)*, 261 B.R. 490, 492 (M.D.Ala.2001) ("[W]here the language used

by Congress in different bankruptcy chapters is substantially similar, the interpretation of that language in one chapter is helpful in interpreting the same language in another chapter. Accordingly, to the extent that there is case law interpreting statutory provisions substantially similar to the statutory provisions at issue here, the court will apply that case law where appropriate.") (citing *Justice v. Valley Nat'l Bank*, 849 F.2d 1078, 1083 (8th Cir.1988)).

**14.** 28 U.S.C. § 586(e)(2) states: "[The trustee] shall collect such percentage fee from all payments received by [the trustee] *under plans* in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee. . . ." (Emphasis added).

cured claims; Chapter 13 does not permit such modifications.[15]

*Fulkrod* accommodates this distinction in the Chapter 12 context, as Chapter 12 debtors may routinely modify farm mortgages and other secured debt, and thereby change the debtor's ongoing payments.[16] The efficient operation of Chapter 12 thus may call for more supervision. Much less need exists in the Chapter 13 context for such creditor "protection," as the Code itself provides much of that protection. *See, e.g.,* 11 U.S.C. § 1322(b)(2), (b)(5), and (d); *see also In re Lopez,* 350 B.R. at 870.

Moreover, the power to make payments in Chapter 13 directly to creditors has never been in doubt. 11 U.S.C. § 1326(c); 5 Keith M. Lundin, *Chapter 13 Bankruptcy* § 401.1, p. 401–1 (3d ed. 2000 & Supp. 2006) ("Direct payment has always been allowed by the Bankruptcy Code in Chapter 13 cases ....."). The problem, however, lies in setting proper boundaries to the power contained in Section 1326(c). Section 1326(c) simply states that "[e]xcept as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to creditors under the plan." It does not state when it is appropriate to insert such direct payment provi-

sions in the plan or in the confirmation order.[17]

To be sure, some authorities rail against direct payment as essentially permitted but pernicious. *See, e.g., In re Perez,* 339 B.R. 385, 390–91 (Bankr.S.D.Tex.2006). Even Judge Lundin, whose authoritative treatise states that the power to make direct payments is unassailable, qualifies that proposition by stating that "the practice is disfavored." Lundin, *supra.* Reflecting the discretion granted by the Code, different courts and different circuits have different rules on the permissibility of direct payment, a fact unchanged by or since *Fulkrod. See, e.g., In re Martinez,* 281 B.R. 883, 884 n. 1 (Bankr. W.D.Tex.2002) ("In this district, post-petition mortgage payments in chapter 13 cases are the responsibility of the debtor to pay directly to the lender. Only the payments on pre-petition arrearages are included as part of the plan distribution."); *In re Teagardner,* 98 B.R. 318, 321 (Bankr. S.D.Ohio 1989) (Local bankruptcy rule requiring payment of home mortgage through the Chapter 13 trustee if the mortgage is in arrears at the petition "serves the salutary policy of facilitating performance under Chapter 13 plans by debtors who have demonstrated a ques-

---

**15.** Section 1222(b)(9) allows a plan to "provide for payment of allowed secured claims consistent with section 1225(a)(5) [which allows modification of secured claims] ... over a period exceeding the [normal plan period of three or five years]." Section 1322(b) has no equivalent, and thus all modified claims must be paid within the plan term. Indeed, this further supports the panel's holding in this case. If modified secured claims must be paid during the plan term, cure of a default cannot be a modification of the claim. If it were a modification, then the ongoing maintenance payments (only possible because of the cure) would have to be fully paid within the plan period.

**16.** Recall, as opposed to paying a fixed amount of arrearages, in *Fulkrod,* the plan completely restructured the terms and reamortized the payments of the farm mortgages.

**17.** Several courts have dealt with this issue through the use of a local rule. *See, e.g.,* Southern District of Texas Local Rule of Bankruptcy Procedure 3015(b) (requiring that "[h]ome mortgage payments will be made through the chapter 13 trustee...."); Central District of California Local Rule of Bankruptcy Procedure 3015–1(m)(2) and (3) (requiring debtors to make pre-confirmation payments directly to creditor unless the debtor intends to pay through the plan and leaving debtors with discretion regarding post-confirmation payments).

tionable prepetition payment track record."); *In re Weber,* 114 B.R. 194, 198 (Bankr.D.Neb.1988) ("[Section] 1322(b)(5) provides for the curing of a default of a mortgage only when the plan also includes the maintenance of the current mortgage payments while the case is pending.").

*Fulkrod II* arguably changed this dynamic. Adherence to *Fulkrod II's* dicta would deprive bankruptcy courts of the discretion granted them by the Code in Section 1326(c). This makes the analysis in *Fulkrod I* relevant, and shifts the focus of the analysis to whether maintenance payments are "impaired" claims.

## B. Impaired Claims in Chapter 13

*Fulkrod I* essentially required Chapter 12 trustees to pay claims that the court referred to as "impaired" by the Chapter 12 plan through the plan, while allowing the debtor to pay directly those claims not impaired by the plan. We hold to that distinction here, based on the understanding that impairment occurs when the plan purports to pay an obligation as originally scheduled notwithstanding a creditor's nonbankruptcy rights other than the right to accelerate the debt's maturity date. Within this definition, a plan impairs an obligation if it allows or provides for payments designed to cure a default and reinstate a scheduled maturity date after acceleration.

In this case, Mr. Lopez's payment of his mortgage arrears, plus interest, fits this description. Mr. Lopez's plan thus correctly provides for payment of the mortgage arrears by the Chapter 13 trustee. But Mr. Lopez's obligations, which mature after his bankruptcy filing, are not impaired by the plan. Under the plan, Mr. Lopez will make these payments as originally scheduled, both as to time and amount. Under *Fulkrod I,* they could be paid directly by the debtor outside of the plan.

This treatment is justified by the history of the impairment doctrine in this and other circuits, including the special treatment the Bankruptcy Code affords to residential mortgages. As the bankruptcy court noted, Chapter 13 places debts secured by the debtor's residence in a special statutory category. *In re Lopez,* 350 B.R. 868, 870 (Bankr.C.D.Cal.2006); 11 U.S.C. § 1322(b)(2), (b)(5), and (e). In particular, Section 1322(b)(2) specifically denies debtors the right to modify "a claim secured only by a security interest in real property that is the debtor's principal residence." A limited exception to this prohibition exists in Section 1322(b)(5), which allows plans to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any ... secured claim on which the last payment is due after the date on which the final payment under the plan is due." As a consequence, a debtor may "catch up" on missed payments and reinstate mortgage debt even if reinstatement is not contemplated by nonbankruptcy law. What a debtor cannot do, however, is modify the claim by changing the interest rate, the maturity date, or the loan's original amortization.

The bankruptcy court cited *In re Perez,* 339 B.R. 385, 404 (Bankr.S.D.Tex.2006) for the proposition that cures of home mortgages are "permissible modifications." *In re Lopez,* 350 B.R. at 872. Similarly, the bankruptcy court cited *Downey Savings and Loan Assoc. v. Metz (In re Metz),* 820 F.2d 1495 (9th Cir.1987), for the proposition that a "permissible cure" is not a modification of the underlying debt:

> Although a debtor cannot 'modify' (e.g., change the length of the contract or amount of the balance or balloon payment) a claim secured only by the debtor's principal residence, courts have uniformly held that 11 U.S.C. § 1322(b)(2)

... allows the debtor to 'cure' ... arrearages on the debt and thereby reinstate the debt. Thus, while modification of the debt is prohibited, [the debtor's] chapter 13 plan is a permissible 'cure' of a claim because it simply reinstates the original debt after correcting the arrearages.

*Id.* at 1497 (citations omitted).[18] Under these views, the payments anticipated by the debtor's plan would not impair the maintenance payments.

The trustee counters by arguing that the question of whether such treatment "modifies," and therefore impairs, home mortgage debts has already been answered in her favor by the Supreme Court in *Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). That contention does not withstand analysis. *Rake* held that an over-secured creditor could collect post-confirmation interest on pre-petition arrears, regardless of whether the underlying note, deed of trust, or state law permitted interest to accrue on interest. It is only in dicta that the Court stated:

When a plan cures a default and reinstates payments on a claim, the creditor's contractual rights arising from the default—which in this case included the right to declare all payments due and payable, accelerate the debt, possess the property, collect rents generated by the property and foreclose on the property ... are abrogated and therefore 'modified.' These modifications are allowed under § 1322(b)(5) 'notwithstanding' the fact that § 1322(b)(2) generally prohibits the modification of the rights of home mortgage holders.

*Rake*, 508 U.S. at 473 n. 9, 113 S.Ct. 2187.

But the central holding of *Rake* has not endured. In 1994, Congress added Section 1322(e), which effectively overruled *Rake*. Bankruptcy Reform Act of 1994, Pub.L. 103–394; *see Wells Fargo Bank Nw., N.A. v. Yett (In re Yett)*, 306 B.R. 287, 292 (9th Cir. BAP 2004). The thrust of the trustee's argument is that the above-quoted footnote discussed home mortgage claims as unitary concepts; that is, it considers the entire nonbankruptcy claim—both the pre-petition arrears and the post-petition contractual payments—as modified.

Although the trustee argues that the statement regarding the "modified" status of home mortgages is still valid and should continue to carry weight in the instant case, *Rake* included a discussion of Section 1322(b)(5) that contradicts the unitary view of home mortgage claims underpinning this argument. The Court stated:

As authorized by § 1322(b)(5), the plans essentially split each of respondent's secured claims into two separate claims— the underlying debt and the arrearages. While payments of principal and interest on the underlying debts were simply 'maintained' according to the terms of the mortgage documents during the pendency of petitioners' cases, each plan treated the arrearages as a distinct claim to be paid off within the life of the plan pursuant to repayment schedules established by the plans.

*Rake*, 508 U.S. at 473, 113 S.Ct. 2187. This passage indicates that *Rake* assumed that the entire home mortgage claim was comprised of two separate parts. First, there is the amount in arrears. This amount consists of prepetition obligations due but not paid—that is, the claims are "mature"—as of the filing. Second, there is the regular, ongoing post-petition main-

---

**18.** *Downey Savings* is a pre-*Fulkrod* case analyzing whether a debtor had filed his Chapter 13 case in good faith.

tenance payments, in amounts no different from what the debtor would have paid had he or she never defaulted. These consist of obligations under the relevant documents that, but for any pre-petition acceleration of maturity, would be unmatured as of the filing. Thus, bankruptcy law and the plan only modify the claim in relation to the scheduled payments in default at filing. Post-petition payments are different; they are ongoing payments, not due at filing, which will continue to be made after plan completion. They are not altered by the plan.

This is not the only instance in which bankruptcy law divides claims that non-bankruptcy law views as unitary. Section 506(a) splits an under-secured claim into secured and unsecured components.[19] Similarly, Section 1322(b)(5) states that the plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending ...." 11 U.S.C. § 1322(b)(5). Thus, the provision treats the curing of default (and by implication, the payment of arrears) separately from making ongoing maintenance payments.

The immediate argument against this split view of home mortgage claims is that the loan may be reinstated in many cases only if the Bankruptcy Code permits cure.

Only with that essential step taken may the continuing maintenance payments be made as originally scheduled. However, *Rake's* use of the word "maintained," as well as the phrase "maintenance of payments" in Section 1322(b)(5), imply that nothing is truly changed in regard to those payments; they will still be made as originally scheduled. Indeed, the cure of the loan default is tied to repayment of arrears, rather than the ongoing payments; Section 1322(b)(5) discusses the cure in a manner implying that it is inextricably intertwined with the concept of arrears.[20]

Were this panel to hold otherwise and require that all claims modified by the operation of bankruptcy law be paid by the trustee through the plan, virtually nothing would remain for the debtor to pay directly. Among the list of payments that would have to be made through the plan are what are commonly considered unimpaired claims, such as a car loan that was current at the time of filing. Indeed, given the wide use of ipso facto and similar clauses,[21] and the extended scope of the automatic stay of Section 362(a), the act of filing bankruptcy could easily be said to affect and hence impair every claim. Following the trustee's logic, then, every claim would have to be paid through the plan, thus rendering Section 1326(c) meaningless.

19. Section 506(a)(1) provides: "An allowed claim of a creditor secured by a lien on property ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim."

20. This split claim view, as detailed above, is effectively a judicial creation. Nevertheless, it may be the best method of considering these claims in the Chapter 13 context. Indeed, the Court of Appeals in *Fulkrod II* did not rule on a literal reading of the Code either. The Code does not discuss modification or impairment of the claim as a prerequi-

site for determining who must pay the claim, and so the Court of Appeals applied a judicial determination that modified (to be more precise, impaired) claims must be paid through the plan.

That being said, the Bankruptcy Code *does* differentiate between matured and unmatured claims. *See* 11 U.S.C. § 502(b)(2) (claims for unmatured interest not allowed). Thus, although this panel is expanding somewhat the language of Section 1322, it is not doing so without statutory support.

21. The Bankruptcy Code, for the most part, prevents creditors from enforcing these clauses against debtors. *See, e.g.,* 11 U.S.C. §§ 363(*l*), 365(e), 541(c)(1)(B).

Similarly, many Chapter 13 debtors choose to refinance or sell their homes and pay off their plans in full. *See, e.g., Sunahara v. Burchard (In re Sunahara)*, 326 B.R. 768 (9th Cir. BAP 2005). In such cases, unsecured creditors are paid through the plan, while payments to creditors secured by the asset sold or refinanced are paid directly by the escrow agent. Under the trustee's view, the escrow agent should pay the money directly to the trustee, who would then forward the amounts to the secured creditors, taking a fee—in this instance, 10%—in the process.

As a result, under a literal reading of *Fulkrod II's* dicta and a broad view of what is an impaired claim, the trustee would be forced to make payments on every debt owed by the debtor, regardless of whether ·the debt was in default at the time of filing. Although this would certainly increase the trustee's revenue, it would harm unsecured creditors and significantly detract from an efficient administration of the estate.

While this is a difficult issue, with argu·ments on both sides, this panel nevertheless concludes that the ongoing maintenance payments are not modified by the Chapter 13 bankruptcy. As a result, *Fulkrod II*, notwithstanding its potential applicability to cases under Chapter 13, need not be applied in the instant case, because it deals with impaired claims only, and because regular, ongoing maintenance payments, such as those at issue here, are not impaired claims.

### 2. Post–BAPCPA Statutory Language and Authority

■ In addition to *Fulkrod* and 28 U.S.C. § 586, the trustee also cites various old and new provisions of Title 11 in support of its position. The trustee argues that even were this panel to find that *Fulkrod* does not apply to cases under Chapter 13, it must nevertheless find in

the trustee's favor as a result of the plain meaning of these provisions.

■ The starting point for interpreting a statutory provision is the language of the statute itself. *See Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2003) ("The starting point in discerning congressional intent ... is the existing statutory text ... and not the predecessor statutes. It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.' "), quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (internal quotation marks omitted), in turn quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Following *Lamie*, the trustee first argues that when reading Section 1322(a)(1), the plain meaning of the statutory provision requires the debtor to pay all modified debts through the plan with the trustee acting as disbursing agent. However, the trustee's argument is difficult to follow, as a plain reading of the section appears to require no such thing.

Section 1322 states:

(a) The plan shall—

(1) provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan;

11 U.S.C. § 1322(a)(1). The trustee argues that, unless this section is a meaningless tautology, it must require the debtor to submit sufficient funds to the trustee to enable the trustee to pay those claims that

must be paid through the plan. While this is likely the correct interpretation of the statutory section, it does not immediately lead to the result that the trustee seeks. Section 1322(a)(1) does not require that all debts must be paid through the plan; it merely requires that the debtor must submit enough money from his future earnings to "the supervision and control of the trustee" as is necessary to fund the plan. Section 1322(a)(1) says nothing else, though, about what exactly must be paid through the plan.

The trustee also argues that BAPCPA's changes to Section 1326(a) now mandate that this panel find in its favor. Pre–BAPCPA, Section 1326 provided:

(a)(1)Unless the court orders otherwise, the debtor shall commence making the payments proposed by a plan within 30 days after the plan is filed.

11 U.S.C. § 1326 (2004). BAPCPA amended the language of this section to require debtors to start making payments earlier—effectively within 30 days after the bankruptcy petition is filed, rather than 30 days from when the plan is filed. Additionally, the revised section now provides for specific types of debts that can be paid by the debtor outside of the plan. The revised section states:

(a)(1)Unless the court orders otherwise, the debtor shall commence making payments not later than 30 days after the date of the filing of the plan or the order for relief, whichever is earlier, in the amount-

(A) proposed by the plan to the trustee;

(B) scheduled in a lease of personal property directly to the lessor for that portion of the obligation that becomes due after the order for relief, reducing the payments under subparagraph (A) by the amount so paid and providing the trustee with evidence of such payment, including the amount and date of payment;

(C) that provides adequate protection directly to a creditor holding an allowed claim secured by personal property to the extent that claim is attributable to the purchase of such property by the debtor for that portion of the obligation that becomes due after the order for relief, reducing the payments under subparagraph (A) by the amount so paid and providing the trustee with evidence of such payment, including the amount and date of payment.

11 U.S.C. § 1326 (2006).[22]

The trustee argues that these new statutory provisions list only two circumstances (both involving only debts on personal property) in which the debtor can make payments outside of the plan. From this point, the trustee argues that the statute must require all other debt payments to be made through the plan. The trustee's argument effectively utilizes the canon of construction: *Expressio unius est exclusio alterius.* See *Ex parte Christy,* 44 U.S. 292, 313, 3 How. 292, 11 L.Ed. 603 (1844); *Carlson v. Reed,* 249 F.3d 876, 882 (9th

---

**22.** It is worth noting that changes to Section 1326(a) under BAPCPA are the only substantive changes to the Code that significantly impact the current issue. As a result, the majority of support for the trustee's position derives from *Fulkrod.* The *Fulkrod* case was decided by the Ninth Circuit in 1992. Why then, other than the unpublished decision from Alaska, *In re Barocio,* 2003 Bankr.LEX-

IS 2032 (Bankr.D.Alaska 2003), has no other trustee put forth this position nor any other opinion commented on this issue within the Ninth Circuit in the past 15 years? Indeed many districts within the Ninth Circuit, including the Central District of California, include a checkbox on their mandatory form plans allowing the debtor to choose to pay outside the plan. *See* note 3, *supra.*

Cir.2001). This phrase roughly translates as "the expression of one thing implies the exclusion of alternatives." Thus, the argument goes, by specifically enumerating certain situations in which the debtor can make payments outside of the plan, Congress implicitly required all other payments to be made by the trustee through the plan.

This argument, however, fails when one looks to Section 1326(c), rather than just Section 1326(a). Section 1326(c) provides, "Except as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to creditors under the plan." This language pre-dates and was unchanged by BAPCPA. A plain reading of this provision leads to the conclusion that Congress intended that some debts other than those specifically enumerated in Section 1326(a)(1) could also be paid by the debtor outside of the plan, so long as either the plan itself or the order confirming the plan allows it. *See In re Vigil*, 344 B.R. 624, 629 (Bankr.D.N.M. 2006) ("Because the language in 11 U.S.C. § 1326(c) clearly contemplates that some payments will not be made by the trustee, it is not appropriate for this Court to impose a general rule requiring that all payments called for in a plan of reorganization be disbursed by the Chapter 13 Trustee.").

*Fulkrod* looked at this issue in the context of Section 1226(c), which is essentially identical to Section 1326(c). The Ninth Circuit stated that this provision, in conjunction with Section 1225(a)(5)(B)(ii),[23] "merely recognize[s] that the debtor may, as a disbursing agent, sign checks and

make cash payments." *Fulkrod II*, 973 F.2d at 803. The court rejected the argument that Congress implicitly intended to permit debtors to make direct payments to impaired creditors through Section 1226(c).

When read literally, Section 1326(c) provides that not all payments need be made by the trustee under the Chapter 13 plan. Holding that this language instead merely applies to the debtor's ability to "sign checks and make cash payments" requires a strained interpretation of the Code that does not follow the strictures of plain-meaning construction described in *Lamie*.

Recent post-BAPCPA case law is also supportive of the debtor's position. The only two published cases to have discussed this issue post-BAPCPA (apart from the bankruptcy court's decision in this case) are *In re Clay*, 339 B.R. 784 (Bankr. D.Utah 2006) and *In re Vigil*, 344 B.R. 624 (Bankr.D.N.M.2006).

*Clay*, like this case, involved a Chapter 13 debtor who filed a plan intending to pay pre-petition arrears through the plan while making regular, ongoing maintenance payments directly to the creditor outside of the plan. *Clay*, 339 B.R. at 785. *Clay* analyzed the changes to the statutory scheme under BAPCPA in light of its earlier holding in *In re Case*, 11 B.R. 843 (Bankr.D.Utah 1981). In *Case*, the court "concluded that a debtor may freely choose to pay a secured creditor directly, independent of the Chapter 13 trustee, where the debtor is not seeking to discharge the debt or otherwise alter any rights of the creditor." *Clay*, 339 B.R. at

**23.** Section 1225(a)(5)(B)(ii) is the Chapter 12 equivalent of Section 1325(a)(5)(B)(ii). Section 1325(a)(5)(B)(ii) states:
(a) Except as provided in subsection (b) the court shall confirm a plan if—
(5) with respect to each allowed secured claim provided for by the plan—

(B)(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of a claim is not less than the allowed amount of such claim;

785. The *Clay* court reviewed the changes resulting from BAPCPA and determined that, "if anything, the changes to § 1326(a)(1) indicate a Congressional intent to allow debtors to continue making payments to secured creditors directly under the terms of the contract." *Id.* at 788.

The trustee argues that the *Clay* holding actually works against the debtor, due to language in the opinion stating that "the Court determines that the changes impacting the Bankruptcy Code under the BAPCPA did not affect the debtor's right to pay secured creditors directly *so long as the creditor is paid pursuant to the terms of the underlying obligation.*" *Id.* at 789 (emphasis added). As the trustee's position is that the creditor in the instant case is *not* being paid pursuant to the terms of the underlying obligation due to the modification of its rights, it therefore cannot be paid outside the plan according to the above quotation from *Clay*.

However, the *Clay* court's statement must be read in the context of its holding that payment outside of the plan by the debtor of regular, ongoing maintenance payments is allowed. Thus, the above language must be read more narrowly, to only refer to changes in the underlying obligation outside of a traditional "cure." The language does not refer to the actual ongoing payments made by the debtor, which are made according to the terms of the underlying obligation. Instead, it applies to larger-scale modifications, such as payments on arrears, excepting the ongoing maintenance payments.

*In re Vigil*, another post-BAPCPA case, involved the question of whether a debtor can make payments outside of the plan on debts secured by personal property. The court analyzed the same statutes at issue here and determined that the language of Section 1326(c) allowed the debtor to make such payments. The *Vigil* court provided an exhaustive review of the cases analyzing these statutory provisions:

The plain language of 11 U.S.C. § 1326(c) is that the plan or the order confirming the plan can 'otherwise provide' for payments to creditors under the plan. 11 U.S.C. § 1326(c). The code, therefore, does not prohibit direct payments at the same time that it presumes that most payments will be made through the trustee. *See In re Aberegg*, 961 F.2d 1307, 1309 (7th Cir.1992) (discussing § 1326(c) and § 1322(a)(1), and finding that the language in § 1322(a)(1) 'has been uniformly interpreted as giving bankruptcy courts the discretion to permit debtors to make payment directly to some secured creditors, provided that the plan meets all the confirmability requirements set forth in § 1325(a).'); *In re Foster*, 670 F.2d 478, 486 (5th Cir.1982) ('We agree with those courts which have concluded that Congress left open in § 1326(b) [now codified at § 1326(c)] the possibility of direct disbursements 'under the plan' by the Chapter 13 debtor.').... Even courts that conclude that a debtor should not be allowed to deviate from the general presumption that all plan payments should be made through the trustee absent significant or compelling reasons acknowledge that the Bankruptcy Code allows debtors to act as disbursing agents. *See, e.g., [In re Perez*, 339 B.R. 385, 390 (Bankr.S.D.Tex.2006)] (acknowledging that 'the Bankruptcy Code does allow for debtors to bypass the trustee and make payments directly to creditors.'); *[Barber v. Griffin (In re Barber)*, 191 B.R. 879, 884 (D.Kan.1996)] ('Based upon a plain reading of § 1326(c), Congress clearly envisioned "the possibility of direct disbursements 'under the plan' by the Chapter 13 debtor.' ") (quoting *In re Foster*, 670 F.2d at

486); [*In re Harris*, 107 B.R. 204, 206 (Bankr.D.Neb.1989)] (noting that '[t]here is no statutory requirement that all claims provided for in a Chapter 13 plan be paid through the trustee.'); [*First Bank & Trust v. Gross (In re Reid)*, 179 B.R. 504, 507 (E.D.Tex.1995)] ('Section 1326(c) demonstrates that this method of disbursement is not exclusive . . .').

*Vigil,* 344 B.R. at 629. Most significantly, the *Vigil* court determined that the holdings in the above-quoted cases were not altered by changes to the statutory language under BAPCPA. *See id.*

Thus, both *Vigil* and *Clay* support the debtor's ability to make regular payments on secured debt outside of the plan. While this panel must consider these cases (as well as the many cases cited within *Vigil* ) in light of the Ninth Circuit holding in *Fulkrod,* the interpretation of Section 1326(c) by the courts in *Vigil* and *Clay* is nevertheless much closer to a "plain reading" of the statutory text than is the reading given by the Ninth Circuit in *Fulkrod.*

Another concern raised by the trustee is the effect of this panel's holding on the efficiency of the Chapter 13 system as well as the ability of the trustee to meet all of its statutory requirements under the Code. The National Association of Chapter Thirteen Trustees' (the "NACTT") amicus brief addresses this issue in detail, arguing that the various statutory duties of the Chapter 13 Trustee manifest a presumption that the trustee will be the principal disbursing agent. The various provisions discussed by the NACTT are:

- *Section 1302(b)(1)*—requires the trustee to perform various duties enumerated in Section 704, including the duties under Section 704(a)(7) and (9), to provide information concerning the estate and the estate's administration to parties in interest and to make a final report and file a final account of the administration of the estate with the court and with the United States Trustee;

- *Section 1302(b)(2)(C)*—if the debtor seeks a modification of the plan, the trustee must be heard on the issue;

- *Section 1307(c)*—the trustee has a duty to monitor performance of the debtor under the plan, seeking dismissal or conversion if the debtor fails to perform;

- *Section 1329*—if the debtor's circumstances merit it, the trustee is charged with seeking an appropriate modification of the plan.

Of the above-mentioned statutory duties, the only ones with any significant relevance to the current case are those arising from Sections 1302(b)(1) and 1307(c).[24] Section 1307(c) sets forth a duty that can be significantly affected by payments outside of the plan. This section requires the trustee to monitor performance under the plan. Arguably, this includes payments outside of the plan, if they are mentioned within the plan. By not submitting ongoing maintenance payments to the trustee, the trustee is unable to easily monitor and

---

**24.** Sections 1302(b)(2)(C) and 1329, while clearly expressing statutory duties and rights of the trustee, are not affected by whether the debtor makes ongoing maintenance payments outside of the plan. If the debtor attempts to modify the plan, the trustee will learn of the attempt and can act under Section 1302(b)(2)(C). Payments outside of the plan would not affect this right. Similarly, if the debtor's circumstances change, the trustee can seek modification regardless of whether the debtor is making payments outside of the plan. A change in circumstances will reach the trustee's attention no faster if all payments are made within the plan, and the trustee's ability to seek modification is in no way compromised by outside payments.

ensure that the debtor is making regular payments to those creditors.

Similarly, Section 1302(b)(1) references Section 704(a)(7) and (9), requiring the trustee to furnish information concerning the estate to parties in interest and to submit an accurate final account of the administration of the estate. 28 U.S.C. § 589b(d) lists the required contents of the trustee's final report. These include a listing of receipts and disbursements of the estate as well as a listing of distributions to claimants. The ability of the trustee to accurately provide the required information either to parties in interest or in the final account would be significantly hampered if the debtor were to make payments outside of the plan, as the trustee would be unable to accurately state that those payments were made without proof from the debtor of such payments.

■ While the panel sympathizes with the NACTT's concerns, it nevertheless does not view the above-described statutory responsibilities as creating any inherent presumption that all payments must be made by the trustee. Instead, the panel suggests that this concern could be alleviated through a requirement by the trustee (either in the plan or by incorporation in the local plan guidelines) that the debtor send proof of direct payment regularly to the trustee. This would allow the trustee to accurately monitor the debtor's performance as well as provide the trustee with data from which to fashion an accurate and complete final account.

### 3. The Trustee's Concerns Regarding Lost Revenue

Needless to say, the trustee is quite concerned with the potential revenue effects of a ruling on this issue. If this panel were to determine that the debtor must make his maintenance payments through the plan, this will result in an additional $3,078 being paid through the plan each month, thus yielding an additional $308 in fees to the trustee each month. As maintenance payments are generally quite large compared to total other aggregate plan payments, the addition of maintenance payments to plans generally could potentially lead to a significant increase in revenue to the standing Chapter 13 trustees.

■ The Ninth Circuit considered this issue in *Fulkrod,* stating:

> If Congress had intended to fund the trustee out of the common burse, such a decision presumably would have been a valid exercise of its authority. Instead, Congress required that a percentage of the assets of the estate in bankruptcy fund the trustee, and more specifically, a percentage of payments received by the trustee under the plan of reorganization. It is fairly certain that if the debtor is entitled to make direct payments to impaired creditors the trustee will receive nothing. This is hardly an outcome Congress could have intended.

*Fulkrod II,* 973 F.2d at 802. However, acknowledging that Congress intended for the standing Chapter 13 trustees to be paid from payments received under the plan does not inherently lead to a conclusion that *all* payments must therefore be made under the plan. *See* 11 U.S.C. § 1326(c). Congress may very well have analyzed the financial requirements of the Chapter 13 trustee program and determined that, even with debtors making payments outside of the plan on certain secured debts, the trustees would still receive more-than-adequate funding. Indeed, in analyzing the raw data on trustee compensation provided by the Office of the United States Trustee, this panel found that of the thirty-five Chapter 13 trustees listed within the Ninth Circuit,

thirty-two received maximum compensation in 2006 (91.4% of the trustees).[25] The average income of Chapter 13 trustees within the Ninth Circuit in 2006 was $165,139.34—only $5,384.66 less than the maximum compensation of $170,524 (and the vast majority of that difference was caused by one extreme outlier). Nationwide, 91% of Chapter 13 trustees received maximum compensation. Considering that many jurisdictions have allowed debtors to make maintenance payments outside of the plan for the past 20 years, and this has not lead to the insolvency of the standing Chapter 13 trustee program, the addition of fees for ongoing maintenance payments is not required for the financial health of the program.

Nor have we been offered any analysis of the impact of the proposed change on unsecured creditors in those instances where debtors have some excess disposable income over that necessary to pay their priority and secured creditors. Ruling for the trustee would have the impact in those instances of shifting payments from unsecured creditors to trustees as priority administrative expenses.

Finally, it is not at all clear that trustee in this case or the Chapter 13 trustee program would realize any net gain if the trustee's position were adopted; neither the trustee nor the amicus proffer any evidence or data on the overall economic impact of such a change. Here, the uncontested evidence is that debtor simply could not pay any more; his plan payment already equals his disposable income after deducting his expenses, and the additional $308 a month the trustee seeks would render it infeasible. Dismissal would follow, and the trustee would have a net loss in this case. There is nothing in the record

suggesting how elastic or inelastic the demand for Chapter 13 relief is, either in the trustee's district or nationally.

### *CONCLUSION*

While an argument can be made to apply *Fulkrod* to cases filed under Chapter 13 in the Ninth Circuit, a more in-depth analysis, and the better reasoning, compels us to conclude that *Fulkrod* does not dictate the outcome in the current case. We believe the bankruptcy court was correct in confirming the debtor's Chapter 13 plan, and its decision is therefore AFFIRMED.

---

**25.** All of the calculations discussed above were derived from the FY–2006 Chapter 13 Trustee Audited Annual Reports, located at http://www.usdoj.gov/ust/eo/private _ trustee/library/chapter13/docs /ch13ar06–AARpt.xls.